UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RBS CITIZENS BANK, N.A.,

       Plaintiff,                                  Civil Action No.
                                                    13-cv-12416

v

                                                    HON. MARK A. GOLDSMITH

THOMAS E. PURTHER and
SCOTT JACOBSON,

       Defendants.
_____/


**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 15)**

**I.       INTRODUCTION**

In this case, Plaintiff RBS Citizens Bank, N.A. sues Defendants Thomas E. Purther and Scott Jacobson for breach of a guaranty agreement. Compl. (Dkt. 1). The matter is presently before the Court on Plaintiff's motion for summary judgment (Dkt. 15). Defendants do not contest that they are liable for breach of the guaranty agreement, but they do dispute the amount of damages to which Plaintiff is entitled under the guaranty. Defendants contend that a provision in the guaranty limiting their liability to 50% of the "outstanding loan balance" means that the proceeds of the sale of collateral should be deducted from the loan balance before applying the 50% limitation. Plaintiff argues that no such deduction should be made in determining the outstanding loan balance. For the reasons that follow, the Court concludes that the loan documents are ambiguous as to the operation of the 50% limitation. The Court will grant the motion for summary judgment with respect to Defendants' liability, but deny the motion with

1

respect to the issue of damages.

## II. BACKGROUND

Plaintiff is a national banking association and successor by merger to Charter One Bank, N.A. Certificate of Corporate Existence (Dkt. 15-3); Certificate of Merger at 2 of 62 (CM/ECF pagination) (Dkt. 15-4); Aff. of Thomas E. Thompson, vice president of Pl. ¶ 23 (Dkt. 15-2).

On June 7, 2002, Charter One made a mortgage loan to Port of Call Associates, LLC ("POCA"); POCA executed a promissory note in favor of Charter One in the principal loan amount of $940,000, secured by a mortgage on real property and an assignment of leases and rents. Note at 1 (Dkt. 15-5).[1] The note provides, "[I]f not sooner paid, all unpaid principal, all accrued and unpaid interest, and all other sums due and payable under this Note or any of the other Loan Documents shall be due and payable in full on July 1, 2012, (the 'Maturity Date')." Id. at 3.

At the time the loan was made, a guaranty agreement was executed between Defendants Thomas E. Purther and Scott Jacobson, as guarantors, and First Federal of Michigan, the Michigan operating name of Charter One Bank, N.A. Guaranty at 1 (Dkt. 15-6). The guaranty provides in part:

> [T]he Guarantors hereby irrevocably and unconditionally, jointly and severally, guarantee to Lender:
>
> A. the payment when due, whether by acceleration or otherwise, of the indebtedness owing pursuant to the terms of the Loan Documents (the

---

[1] Defendants assert that the promissory note was executed by POCA in favor of "First Federal of Michigan," not in favor of Charter One. Def. Counter-Statement of Material Facts ¶ 2 (Dkt. 19). However, the note states that POCA "hereby promises to pay to the order of First Federal of Michigan, the Michigan operating name of Charter One Bank, N.A. . . . ." Note at 2 of 8. Further, the guaranty agreement states that it is made "between Thomas E. Purther and Scott Jacobson . . . and FIRST FEDERAL OF MICHIGAN, the Michigan operating name of Charter One Bank, N.A. . . ." Guaranty at 1 (Dkt. 15-6). In the absence of any contrary evidence, there is no genuinely disputed issue of fact that First Federal of Michigan is simply a name under which Charter One operated.

> "Indebtedness"); and
>
> B. the prompt and complete performance by Borrower of all undertakings, promises and agreements as contained in the Loan Documents (the "Obligations") other than the Indebtedness; and
>
> C. notwithstanding the above, Guarantors shall be limited to fifty percent (50%) of the outstanding Loan balance.
>
> This is a guaranty of payment and not of collection. Upon the occurrence of an Event of Default, Lender may make demand directly upon the Guarantors for the performance and payment of the above without making demand upon, or pursuing or exhausting any remedy, or instituting proceedings against Borrower or any other person, or against any assets of Borrower, or against any security held by Lender.

Id.

It is undisputed that POCA failed to repay the loan in full by July 1, 2012, the maturity date. Thompson Aff. ¶ 7; Def. Counter-statement of Material Facts ¶ 6 (Dkt. 19). The instant lawsuit was filed on June 3, 2013, asserting breach of the guaranty agreement (Dkt. 1).

In October 2013, POCA and Defendants requested that Plaintiff discharge its mortgage and assignment of leases and rents on the secured property to allow for a sale of the mortgaged property. Thompson Aff. ¶ 12. Plaintiff agreed to discharge certain rights under the mortgage and assignment, pursuant to a discharge agreement negotiated between, and executed by, POCA, Defendants, and Plaintiff. Id. ¶ 13.

The discharge agreement, dated October 22, 2013, provides:

> The sum to be remitted to Lender to obtain the Discharges shall be gross proceeds to be realized by the Borrower from the sale of the Property . . . (the "Release Consideration"). The Release Consideration will be applied toward payment of the Borrower's indebtedness owing to Lender pursuant to the terms of the Note shall be applied [sic] in accordance with the terms of the Loan Documents (defined below), but shall not affect the determination of the outstanding Loan balance or the determination of the Guarantors' or Lender's respective rights and obligations under the Guaranty dated June 7, 2002 . . . .

Discharge Agreement at 3 of 7 (CM/ECF pagination) (Dkt. 15-7). The agreement further states, "The Lender and the Guarantors acknowledge and agree that this Discharge Agreement shall not affect their respective rights and obligations under the Guaranty, and shall be without prejudice to their respective claims and defenses in the pending litigation entitled RBS Citizens, N.A. v. Thomas E. Purther and Scott Jacobson . . . ." Id. at 4 of 7.

On October 24, 2013, Plaintiff executed and delivered the discharge of its rights in consideration of its receipt of $430,843.02, the release consideration. Thompson Aff. ¶ 18. Plaintiff applied the release consideration toward payment of POCA's outstanding late charges, interest, and principal balance. Id. ¶ 19.

Thompson testified that the principal loan amount as of the maturity date, before application of the release consideration, was $732,991.93. Id. ¶ 16. Thompson testified that as of October 24, 2013, the interest due at 6.5% was $67,504.42, the default interest was $39,092.90, and late charges were $37,166.55, making the total outstanding indebtedness $876,755.80. Id. These amounts are not disputed by Defendants. Def. Counter-statement of Material Facts ¶¶ 12, 13, 16.

Under Plaintiff's view of how the 50% limitation operates, any post-default collections — such as the release consideration — are ignored, and Defendants' liability is fixed at 50% of the total indebtedness as of the date of default plus 50% of later accruing interest and charges.[2] As of

---

[2] Under Plaintiff's view, the release consideration is not entirely irrelevant. Defendants cannot be required to pay more than the indebtedness less collections. This difference represents the outside limit of what Defendants could be required to pay. Thus, if the release consideration had been equal to the indebtedness of $876,755.80, Defendants would owe nothing, even though under Plaintiff's view the "outstanding loan balance" remains at $876,755.80. In our case, that limit plays no role because the difference between total indebtedness and the release consideration exceeds 50% of the "outstanding loan balance," as Plaintiff construes that term.

October 24, 2013, this figure is $438,377.90. Pl. Br. in Support of Mot. for Summ. J at 13 (Dkt. 15). Under Defendants' view, the 50% limitation takes into account any post-default collections – including the release consideration. Thus, Defendants would subtract $430,843.02 (the release consideration) from $876,755.80 (total indebtedness as of October 24, 2013) and then apply the 50% limitation. This yields an amount owed of $222,956.39 (plus 50% of later-accruing interest and charges). Def. Resp. at 8-9 (Dkt. 19).[3]

### III. LEGAL STANDARD

Summary judgment should be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained,

> Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." . . . The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by "showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party.

Biegas v. Quickway Carriers, 573 F.3d 365, 373-374 (6th Cir. 2009) (citations omitted).

### IV. ANALYSIS

**A. Liability**

Plaintiff contends that there is no genuine issue of material fact as to liability under the guaranty, and that Plaintiff has demonstrated each element of its breach of guaranty claim. Pl. Br.

---

[3] As discussed infra, there is no dispute that Plaintiff is also entitled to 100% of attorney fees and other costs of collection.

5

in Support of Mot. for Summ. J. at 10-11 (Dkt. 15). Defendants do not contest Plaintiff's arguments as to liability. See generally Def. Resp. (Dkt. 19).

Under Michigan law (which is made expressly applicable under the guaranty agreement), a guaranty is construed like any other contract, and the intent of the parties as discerned from the entire instrument governs its interpretation. First Nat. Bank v. Redford Chevrolet Co., 258 N.W. 221, 223 (Mich. 1935). The elements of a breach of contract action are (i) the existence of a contract between the parties, (ii) the terms of the contract, (iii) breach of the contract, and (iv) damages. Webster v. Edward D. Jones & Co., L.P., 197 F.3d 815, 819 (6th Cir. 1999) (applying Michigan law). There is no genuine dispute of material fact regarding any of these elements.

First, it is undisputed that there exists a contract – the guaranty agreement – between the parties. Second, the terms of the guaranty agreement that relate to a determination of liability under the guaranty are not in dispute. Third, there is no dispute that Defendants, whose obligation to pay was triggered when the borrower did not repay the loan in full by the maturity date, breached the guaranty agreement by failing to pay any amount under the guaranty. See Thompson Aff. ¶ 7. Finally, it is undisputed that the breach caused Plaintiff damages.

Because it is undisputed that Plaintiff has demonstrated all of the elements of its breach of guaranty claim, Plaintiff is entitled to summary judgment in regard to liability.

**B. Damages**

    **1. Ambiguity**

Plaintiff maintains that the amount owed by Defendants is 50% of the total "loan balance," as determined by the amount due on the maturity date. Pl. Br. in Support of Mot. for Summ. J. at 13-14. Plaintiff argues that Defendants guaranteed the payment of the "indebtedness" when "due," and that Defendant's liability became fixed at the time of default. Pl. Reply at 2-3 (Dkt.

20). According to Plaintiff, Defendants are not entitled to deduct the release consideration in calculating the 50% limitation; such post-default collection would only be relevant if Defendants' liability would exceed the difference between total indebtedness and collection. Pl. Br. in Support of Mot. for Summ. J. at 15-16, 20-21; see also discussion, supra, at n.2. Defendants respond that the guaranty agreement is ambiguous as to how the term "outstanding loan balance" should be determined; that nothing in the loan documents defines "outstanding loan balance;" and that nothing in the documents indicates that the outstanding loan balance becomes permanently fixed at a certain point in time. Def. Resp. at 6-7. Defendants argue that their obligation under the guaranty is, at most, 50% of the total outstanding loan balance — where the outstanding loan balance is calculated as the loan balance at the maturity date, plus interest and charges, less $430,843.02 in sale proceeds. Id. at 6-7, 9.

In light of the parties' arguments, the Court turns to applicable law. "A contract is ambiguous when two provisions 'irreconcilably conflict with each other,' or 'when [a term] is equally susceptible to more than a single meaning.' Whether a contract is ambiguous is a question of law. Only when contractual language is ambiguous does its meaning become a question of fact." Coates v. Bastian Bros., Inc., 741 N.W.2d 539, 543 (Mich. Ct. App. 2007) (citations omitted ).

The Court concludes that the guaranty agreement and discharge agreement are, on their face, ambiguous as to the amount owed by Defendants. The guaranty provides:

> [T]he Guarantors hereby irrevocably and unconditionally, jointly and severally, guarantee to Lender:
>
> A. the payment when due, whether by acceleration or otherwise, of the indebtedness owing pursuant to the terms of the Loan Documents (the "Indebtedness"); and
> . . .

7

> C. notwithstanding the above, Guarantors shall be limited to fifty percent (50%) of the outstanding Loan balance.

Guaranty at 1.

The above provisions are equally susceptible to more than one meaning. Although Defendants owe "the payment when due" of the "indebtedness," this obligation is qualified by a limitation of Defendants' liability to 50% of the "outstanding loan balance." The term "outstanding loan balance" is not defined in the guaranty.[4] And there is no indication whether "outstanding loan balance" is the same as "indebtedness." Defendants make a plausible argument that the use of different terms signifies that the terms mean different things. Further, the use of the term "notwithstanding the above" in item C suggests a limitation on whatever liability amount is created under item A. See, e.g., Gray v. Chrostowski, 828 N.W.2d 435, 440 (Mich. Ct. App. 2012) ("'Notwithstanding' means 'in spite of; without being opposed or prevented by.'" (citations and formatting omitted)); Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993) (" [T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." (citations omitted)).

Therefore, the terms establishing the liability of Defendants are facially unclear as to how the outstanding loan balance should be calculated — namely, whether it becomes fixed at the loan maturity date or whether it may change after the maturity date based on reduction of the loan balance through Plaintiff's collection efforts. Because there is a question of fact as to the extent of damages available for breach of the guaranty agreement, summary judgment is not appropriate

---

[4] The guaranty provides that "[a]ll terms not otherwise defined herein shall have the same meaning as set forth in the Note, Mortgage or Assignment of Leases and Rents . . . ." Guaranty at 1. However, as Defendants point out, nothing in the loan documents attached to the briefs defines "outstanding loan balance." Def. Resp. at 7.

on the issue of damages. See Klapp v. United Ins. Group Agency, 663 N.W.2d 447, 453-454 (Mich. 2003) ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury.").

### 2. Plaintiff's unavailing arguments

Plaintiff raises several arguments, none of which is persuasive.

#### a. Contractual provisions

Plaintiff argues that various provisions in the guaranty and discharge agreements establish that the release consideration may not be deducted from the amount of Defendants' obligation. Pl. Br. in Support of Mot. for Summ. J. at 20-21; Pl. Reply at 1. Specifically, Plaintiff relies on the following provisions:

- "[The] liability of Guarantors shall not be affected by . . . the release of any portion of . . . the Mortgaged Property." Guaranty at 2.

- "Guarantors unconditionally waive . . . [a]ny set-offs or counterclaims against Lender which would otherwise impair Lender's rights against the Guarantors . . . ." Guaranty at 3.

- "The Release Consideration . . . shall not affect the determination of the outstanding Loan balance or the determination of the Guarantors' and Lenders' respective rights and obligations under the Guaranty . . . ." Discharge Agreement at 3 of 7.

See Pl. Br. in Support of Mot. for Summ. J. at 19-21; Pl. Reply at 1-3.

The Court concludes that none of these provisions sheds dispositive light on the intent of the parties regarding the limitation of Defendants' liability to 50% of the outstanding loan balance. The "liability of the Guarantors," "Lender's rights against the Guarantors," and the parties' "respective rights and obligations under the Guaranty" are all dependent upon the meaning of "outstanding loan balance" – a term that is never clarified and that is subject to different interpretations.

Nor is there any provision in the guaranty that explains how the different provisions upon which Plaintiff relies relate to the 50% limitation, i.e. to the extent the provisions point to contradictory outcomes, there is no indication which provision should prevail. If anything, the "notwithstanding" provision may well reflect the parties' intent that the 50% limitation trumps any contrary provision in the guaranty.

In addition, the provision regarding the release of collateral not impairing the guarantor's liability is a standard guaranty provision, in contrast to the customized 50% limitation. It is typically designed to override the common law rule that the release of collateral discharges the guaranty unless the guarantor consents. See, e.g., Owen v. Potter, 73 N.W. 977, 983 (Mich. 1898) ("Usually a guarantor is discharged by a release of security . . . ."); 38 Am. Jur. 2d Guaranty § 74 (2014) ("Notwithstanding the general rule, courts have held that the guarantor is not discharged, despite an impairment of collateral if . . . the guarantor consented to the release or impairment of the security . . . ."). However, with a customized 50% limitation inserted in the subject guaranty, it is arguable that the parties meant that provision to operate independently of the boiler-plate provision addressing release of collateral.

Similarly, the waiver of set-offs and counterclaims does not necessarily mandate Plaintiff's interpretation. A "set-off" is traditionally defined as a legal claim. See, e.g., Roberson Builders, Inc. v. Larson, 758 N.W.2d 284, 285 (Mich. 2008) (Kelly, J., concurring) (concluding that the plaintiff's claim for set-off constituted an "action"); Black's Law Dictionary (9th ed. 2009) (defining "setoff" as "[a] defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim."). A "counterclaim" also constitutes a claim. See, e.g., Drouillard v. Metro. Life Ins. Co., 310 N.W.2d 15, 20 n.6 (Mich. Ct. App. 1981) ("By definition, a counterclaim by a defendant seeks some sort of affirmative relief back against the

plaintiff . . . ."); Black's Law Dictionary (9th ed. 2009) (defining "counterclaim" as "[a] claim for relief asserted against an opposing party after an original claim has been made . . . ."). Under Defendants' view, they are not asserting any claim, by way of set-off or counterclaim. They are simply offering an interpretation of the term "loan balance."

As for the discharge agreement, its provisions are also subject to different interpretations. Plaintiff points to the language stating that the "Release Consideration . . . shall not affect the determination of the outstanding Loan balance . . . ." But Defendants argue that the language means that the parties' actions in allowing the sale of the collateral could not be used to establish any concession by any party in the determination of the "loan balance" issue in court. Support for this view is found in other language used in the agreement, which suggests that the parties simply sought to avoid a waiver of any party's position in this litigation. See, e.g., Discharge Agreement at 4 of 7 (providing that the discharge agreement "shall not affect [the parties'] respective rights and obligations under the Guaranty, and shall be without prejudice to their respective claims and defense in the pending litigation.").

In sum, factual development is required to discern the intent of the parties relative to the various provisions of the guaranty and discharge agreements.[5]

---

[5] In a footnote in its reply brief, Plaintiff quoted the provision in the guaranty agreement stating, "In the event any provision hereof is deemed to be ambiguous by any court of competent jurisdiction, then it is the intent of the Guarantors and Lender that the provision at issue shall be construed by that court in the manner that will best preserve the security of Lender." Guaranty at 4. The Court concludes that, at this point in the proceedings, the application of this term is unclear. Plaintiff has discharged its security interest in the mortgaged property, and Plaintiff does not explain what other security interests it has at this time, or how such security interests would be "best preserve[d]." Notably, the loan documents do not expressly describe the guaranty as security. For these reasons, this provision does not alter the Court's analysis as to the ambiguity of the guaranty agreement.

**b. No obligation to proceed against the borrower or collateral**

It is undisputed that the guaranty agreement does not require Plaintiff to seek recovery from the borrower or collateral before seeking recovery from Defendants. See Pl. Br. in Support of Mot. for Summ. J. at 16-17; Def. Resp. at 9. Plaintiff argues that, because it had no obligation to pursue recovery from the collateral first, the release consideration should not be deducted from the outstanding loan balance. Pl. Br. in Support of Mot. for Summ. J. at 16-17. Defendant responds that, while Plaintiff was not obligated to pursue other collection efforts, once it chose to do so, the amount of the release consideration must be deducted from the outstanding loan balance. Def. Resp. at 9. While both positions are plausible, the ambiguity in the meaning of "outstanding loan balance" renders the Court unable to say as a matter of law whether, once the option of discharging Plaintiff's security interest in the collateral was exercised, the parties intended that the release consideration would be deducted from the loan balance.

The case on which Plaintiff primarily relies, Comerica Bank v. Cohen, 805 N.W.2d 544 (Mich. Ct. App. 2010), is distinguishable. In Cohen, the plaintiff and the defendant entered into a guaranty agreement that contained the following limitation provision: "Notwithstanding anything to the contrary contained herein, the obligations of the Guarantor hereunder shall be limited to 30% of the indebtedness outstanding from time to time under the [loan documents]." Id. at 547. The borrower defaulted on the note, and the plaintiff sought judgment against the defendant. Id. at 547. The court concluded:

> [B]y the plain language of the guaranty, defendant unconditionally and absolutely agreed to pay 30 percent of the indebtedness and plaintiff was not required to foreclose on the real estate or proceed against other collateral before seeking payment from defendant. Furthermore, even if plaintiff did collect money through foreclosure, plaintiff would not be required to offset those funds against the money due from defendant unless the payment by defendant would result in recovery of more than 100

percent of the indebtedness.

Id. at 550 (citations omitted; emphasis in original).

Cohen is inapposite on two grounds. First, the case is factually distinguishable because, in Cohen, no sale of the collateral had taken place; therefore, the language relied on by Plaintiff is dictum. Second, unlike in the instant case, the language of the guaranty at issue in Cohen did not give rise to an ambiguity, because the Cohen guaranty did not include a new and undefined term in the limitation clause; the same term "indebtedness" was used throughout.

### c. Extrinsic evidence

Defendants contend that because the guaranty agreement is ambiguous, it is proper to resort to extrinsic evidence. Def. Resp. at 11. Defendants attach to their response brief exhibits of Defendant Thomas Purther and POCA Manager David Rubin, regarding asserted statements made during the guaranty agreement transaction.[6] Plaintiff argues that the Court is barred from considering extrinsic evidence due to (i) the integration and merger clause in the guaranty and (ii) the Michigan statute of frauds, Mich. Comp. Laws § 566.132(2). Pl. Reply at 4-6. The Court rejects Plaintiff's arguments.[7]

---

[6] Defendant Purther testified that he understood the term "outstanding loan balance" in the guaranty to mean that he "would be responsible for 50% of any amounts that the bank could not recover from POCA on the Loan." Purther Aff. ¶ 3 (Dkt. 19-5). He further testified that Mike Schick, the First Federal Loan Officer who handled the transaction, stated that the exposure of Purther and Jacobson, the guarantors, "was limited to 50% of any shortfall/deficiency the Bank could not recover on the Loan from POCA." Id. ¶ 5. David Rubin, the manager of POCA, testified that he recalls Purther asking Mike Schick to "explain the 50% limit as to liability," and Schick responded that "the Guarantors' exposure was limited to 50% of any shortfall/deficiency the Bank could not recover on the Loan from POCA." Rubin Aff. ¶¶ 5, 6 (Dkt. 19-6).

[7] The Court's finding, supra, that the guaranty is ambiguous does not depend on the extrinsic evidence presented by Defendants. However, the Court addresses the use of extrinsic evidence because this issue will be relevant for trial.

### i. Integration and merger clause

The Michigan Supreme Court has held that "[i]n resolving [] a question of fact, i.e., the interpretation of a contract whose language is ambiguous, the jury is to consider relevant extrinsic evidence." Klapp, 663 N.W.2d at 454 (citations and formatting omitted). However, when parties "include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete 'on its face' and, therefore, parol evidence is necessary for the 'filling of gaps.'" UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 579 N.W.2d 411, 418 (Mich. Ct. App. 1998) (citation omitted). The guaranty agreement in this case contains an integration and merger clause.[8]

The Court concludes that, because it is unclear from the face of the document what the term "outstanding loan balance" means, the guaranty and discharge agreement are "obviously incomplete on [the] face [of the documents]."[9] A contract is incomplete on its face when it "fails to specify obvious elements of the deal struck." Id. at 421 n.12. In this case, the guaranty and discharge agreement are facially incomplete because they fail to specify an obvious element of the

---

[8] The guaranty states, "This Guaranty may only be amended, changed, waived or terminated by an instrument in writing signed by the party against whom enforcement of such amendment, change, waiver or termination is sought. This Guaranty constitutes the entire agreement between the Guarantors and Lender and all prior negotiations are merged herein." Guaranty at 5.

[9] Although Plaintiff argues that Defendants have not contended that the guaranty agreement is obviously incomplete on its face, the Court concludes that Defendants have sufficiently raised this argument in their response brief. See, e.g., Def. Resp. at 7-8 ("[N]othing within the loan documents defines this term ["outstanding loan balance"] and nothing within the loan document ascribes any specific time or date of determination for that liability. . . . There is nothing in the guaranty which provides that the 50% limitation is for all amounts due 'at maturity.' As the drafter of this document, Plaintiff could have easily added this language or clarified that the limitation is calculated at a certain period of time. However, there is no such language. Instead, the language provides that the limitation applies to the 'outstanding loan balance' which Defendants submit is a moving number that changes daily . . . .").

deal: the meaning of the term "outstanding loan balance." Because the contract is facially incomplete, the fact-finder may consider extrinsic evidence to "fill in the gap[]" of what the parties intended by the term "outstanding loan balance." See, e.g., Am. Recycling Ctr., Inc. v. Unique Surfacing, LLC, No. 289538, 2010 WL 2016295, at **2-3 (Mich. Ct. App. May 20, 2010) (reviewing a contract with an integration clause, and determining that extrinsic evidence of the parties' intent was admissible because the contract, which only "vaguely described" some terms, "was facially incomplete" and made it impossible to "accurately estimate a price [of services referenced in the contract]" without further information).

### ii. Michigan statute of frauds

The statute of frauds, Mich. Comp. Laws § 566.132(2), states:

> An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:
> (a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.
> (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.
> (c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation.

Plaintiff's position is that introducing extrinsic evidence of the parties' intent — such as the affidavits submitted by Defendants — would constitute admitting evidence of an oral promise to modify or waive the guaranty. See Pl. Reply at 5-6. However, because the underlying guaranty language regarding the limitation on Defendants' liability is facially ambiguous, the Court cannot say, as a matter of law, that the admission of extrinsic evidence would "modify" or "waive" the meaning of that provision. If Defendants' view of "loan balance" is sustained, then the statements attributable to the loan officials would be consistent with that view — not

modifications or waivers of those provisions.

Furthermore, the statute of frauds does not bar the Court from considering evidence necessary to resolve an ambiguity in the contract language. See, e.g., Opdyke Inv. Co. v. Norris Grain Co., 320 N.W.2d 836, 841(Mich. 1982) (concluding that "extrinsic evidence may be used to supplement, but not contradict, the terms of the written agreement [submitted to satisfy the statute of frauds]"); Kelly-Stehney & Assoc., Inc. v. McDonald's Indus. Prods., Inc., 693 N.W.2d 394, 399 (Mich. Ct. App. 2005) (concluding that to satisfy the statute of frauds, a court may consider "extrinsic evidence showing the surrounding circumstances," stressing that the Michigan Supreme Court "has declined to adopt narrow and rigid rules for compliance with the statue of frauds"); Frost v. Wells Fargo Bank, N.A., 901 F. Supp. 2d 999, 1007 (W.D. Mich. 2012) (applying Kelly-Stehney to a case concerning Mich. Comp. Laws § 566.132(2) and noting that "this district has applied the reasoning of Kelly-Stehney to cases involving financial institutions, declining to adopt narrow and rigid rules for compliance with the statute of frauds within the financial institution context, too"). Here, Defendants seek to offer extrinsic evidence as a way to explain what the parties intended by the language that was used in the written documents — not as some parol promise at variance with the contract language to contradict the terms of the agreement.

For these reasons, the fact-finder, in interpreting the contract, may consider extrinsic evidence to ascertain the intent of the parties regarding the "outstanding loan balance."

In sum, Plaintiff is not entitled to summary judgment on the issue of damages.[10]

---

[10] Plaintiff offered two other arguments that are unavailing. At oral argument, Plaintiff contended that construing the guaranty agreement to reduce the amount of Defendants' liability by the amount of the release consideration would be contrary to public policy, because it would encourage guarantors to breach guaranty agreements by not paying immediately when due. However, Plaintiff has not offered any authority holding that crediting a guarantor with post-default collections is against public policy. Nor has Plaintiff provided any empirical support

**C. Attorney's Fees**

Plaintiff argues that the guaranty requires Defendants to reimburse Plaintiff for its reasonable attorney's fees. Pl. Br. in Support of Mot. for Summ. J. at 14-15. Although Defendants opposed the request for attorney fees in their response, see Def. Resp. at 11-12, at oral argument, Defendants withdrew their objection to the attorney's fees sought by Plaintiff.

The guaranty agreement provides, "The Guarantors agree to reimburse the Lender for any and all costs and expenses, including, but not limited to, reasonable attorneys' fees incurred in the enforcement of any of the duties and Obligations of the Guarantors." Guaranty at 5.

---

for its theory. Simply because a guarantor may get credit for post-default collections does not automatically translate into an incentive to refuse payment. The debtor may well want to avoid additional liability for collection costs, rather than bet on the possibility of a creditor succeeding in other collection efforts. Further, any such incentive can be avoided by a creditor crafting unambiguous language that would make clear that post-default collections will not be credited against the guarantor's liability in the manner Defendants argue for here. Consequently, Plaintiff has not met the burden of showing how the interest in enforcing the parties' alleged intent in permitting a credit for post-default collections would be "clearly outweighed in the circumstances by a public policy against the enforcement of such terms." Mona Shores Bd. of Educ. v. Mona Shores Teachers Educ. Ass'n, MEA/NEA, No. 271592, 2008 WL 3009890, at *6 (Mich. Ct. App. Aug. 5, 2008) (citing Rm. (2d) of Contracts § 178).

In addition, Plaintiff urged a full grant of summary judgment based on the Opinion and Order issued by Judge Gershwin A. Drain in RBS Citizens Bank v. Purther, No. 13-12266, 2014 WL 562280 (E.D. Mich. Feb. 13, 2014). In the case before Judge Drain, Plaintiff RBS Citizens Bank brought a claim that Defendants Thomas Purther, David Rubin, and Anthony Purther breached a guaranty agreement securing a loan made to the borrower, Dunes Associates, LLC. The guaranty agreement contained similar language to that of the guaranty in the instant case; for example, the guarantors guaranteed "payment when due . . . of the indebtedness owing pursuant to the terms of the Loan Documents . . . . Notwithstanding the above, Guarantors shall be limited to fifty percent (50%) of the outstanding Loan balance." Id. at *1. The borrower defaulted on the loan, and the plaintiff sought repayment from the defendant guarantors. Judge Drain concluded that the language of the guaranty agreement was unambiguous and that the plaintiff had no obligation to pursue any remedy prior to seeking repayment from the defendants. Id. at *3. Judge Drain further concluded that parol evidence was not admissible. Id. However, the case before Judge Drain is factually distinguishable; in that case, there was no sale of collateral. Moreover, it does not appear from the opinion that the parties presented to Judge Drain the same arguments that are presented here. For these reasons, Judge Drain's Opinion does not alter the Court's analysis.

17

"Contractual provisions for payment of reasonable attorney fees are generally valid." Sentry Ins. v. Lardner Elevator Co., 395 N.W.2d 31, 35 (Mich. Ct. App. 1986) (citations omitted).

The Sixth Circuit has established the following analysis to determine the reasonableness of an attorney's fee award:

> A starting point is to calculate "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." (This is known as the "lodestar" calculation.) The court should then exclude excessive, redundant or otherwise unnecessary hours. Next, the resulting sum should be adjusted to reflect the "result obtained." This involves two questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"

Jordan v. City of Cleveland, 464 F.3d 584, 602 (6th Cir. 2006) (citation omitted).

Plaintiff has submitted affidavits relating to its calculation of attorney fees. Thompson testified that from the onset of the instant case through November 1, 2013, Plaintiff's attorney fees related directly to the enforcement of Defendants' obligations are $27,487.57 and appraisal expenses are $7,250. Thompson Aff. ¶ 21. Plaintiff's counsel, C. David Bargamian, testified that his hourly rate on this matter from 2010 to March 2011 was $293.13, from April 2011 through the end of 2012 was $263.82, and beginning January 1, 2013 is $250.63. Bargamian Aff. ¶ 5 (Dkt. 15-8). Bargamian also testified that the hourly rate of his partner, Dennis Barnes, was $255.94 from 2011 to 2012 and beginning January 2013, is $243.14. Id. ¶ 6.

The Court concludes that the hourly rates, hours expended (which can be extrapolated based on hourly rates and total fees charged), and amount of expenses are reasonable. Furthermore, the result achieved at this point — a partial grant of summary judgment as to liability and an acknowledgment of damages by Defendants in a significant amount — shows a significant level of success by Plaintiff's attorneys. These factors, taken together with Defendants'

withdrawal of any objection to the attorney's fees, lead the Court to conclude that the fees requested through November 1, 2013 are reasonable. At the conclusion of the case, Plaintiff will be awarded the amounts currently requested for attorney fees and expenses and such additional amounts for fees and expenses to which it may show entitlement.

## V. CONCLUSION

For the reasons stated above, the Court grants Plaintiff's motion for summary judgment with respect to liability and denies Plaintiff's motion for summary judgment with respect to damages.

SO ORDERED.

Dated: May 21, 2014              s/Mark A. Goldsmith
  Flint, Michigan               MARK A. GOLDSMITH
                          United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 21, 2014.

                                 s/Deborah J. Goltz
                                 DEBORAH J. GOLTZ
                                 Case Manager